## Louisville & N. R. Co. v. Gregory.

June 20, 1939.

W. E. Begley, Judge.

William Lewis & Son and Trabue, Doolan, Helm & Helm for appellant.

Flem D. Sampson and John M. Robsion for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—
Reversing.

John Gregory has recovered judgment against the Louisville & Nashville Railroad Company for $25,000 as damages for personal injuries alleged to have been sustained as a result of the negligent operation of one of the railroad company's trains by its agents, servants and employees and it is appealing.

Appellee was employed by the Railway Express Agency and on May 23, 1937, was express messenger on a fast passenger train of appellant running from Atlanta, Georgia, to Cincinnati, Ohio. When the train reached a point a mile or less north of East Bernstadt in Laurel county the engine and five or more cars immediately in back of it were derailed on a sharp curve

and piled up in a confused mass, some of the cars being practically demolished. Appellee was in the third car from the engine when the wreck occurred.

Appellee alleged in substance in his petition as amended that the derailment and wreck of the engine and cars was due to the negligent operation of the train at a dangerous and excessive rate of speed over the curved tracks at the place of the accident; that he sustained injuries which rendered him totally and permanently disabled and that he had and would continue to suffer great pain and anguish; that prior to his injuries he had been earning about $200 per month but since that time had been unable to engage in any character of work or to earn money; that because of his injuries he had expended large sums set out in the petition for medicines, medical attention and hospitalization; that in all these particulars he had been damaged in the sum of $75,000 for which he prayed judgment.

Appellant's answer to the petition as amended consisted of a traverse of the material allegations thereof and an affirmative plea that as express messenger on the train appellee assumed all the risk incident to his employment. A reply controverting the affirmative allegations of the answer completed the issues.

As grounds for reversal it is argued (1) that the damages awarded appellee are excessive; (2) that the instructions to the jury were and are erroneous; and (3) that prejudicial error was committed in the admission of incompetent evidence. We shall first give our attention to grounds 2 and 3.

The only criticism offered to the instructions given is directed at that part of instruction No. 1 which reads:

"* * * The defendant Louisville and Nashville Railroad Company, in contracting to carry the plaintiff Gregory as such express messenger on said train, did not insure his absolute safety, but it was the duty of the defendant, its agents, servants and employees in charge of said train on which the plaintiff was a passenger at the time it was wrecked and derailed to exercise the highest degree of care, skill and diligence in the operation of said train to convey the plaintiff Gregory safely to his destination."

It is urged in effect that the instruction is preju-

dicially erroneous in that the words "highest degree of care, skill and diligence" were not followed by the words "which prudent persons engaged in like business usually exercise," etc. Appellant offered an instruction embodying the latter words which the court refused to give. The case of Louisville & Nashville R. Co. v. Moore, 150 Ky. 692, 150 S. W. 849, and other cases of like import are cited. In the Moore case the judgment was reversed and the cause remanded for new trial, the opinion setting out the instruction that should have been given. The pertinent portion of the first one directed to be given was in substance and effect the same as the instruction offered by appellant which was refused, however, it will be noted from a reading of that opinion that the instructions directed to be given did not contain a separate instruction defining "highest degree of care" as used in instruction No. 1 but the first instruction contained a definition of that term and the same is true of the other cases cited. Instruction 4 given by the court defining terms used in other instructions reads in part:

"The highest degree of care means the utmost care and highest skill exercised by prudent and skillful persons in the management and operation of railroad trains."

This and similar definitions of "highest degree of care" have been approved by the court in Louisville & Nashville Railroad Company v. Kemp's Adm'r, 149 Ky. 344, 149 S. W. 835. See also Louisville, H. & St. L. Railroad Company v. Kessee, 103 S. W. 261, 31 Ky. Law Rep. 617. Standing alone instruction No. 1 would be erroneous in the particular indicated but not so when read and considered in connection with instruction No. 5. The instructions given, when considered as a whole, clearly and fairly presented all issues made by pleading and proof and embodied everything contended for by appellant.

Ground 3 relates to evidence concerning the speed of the train and in that connection it is first argued that the court erred in admitting evidence as to the speed of the train at a point other than that where the accident occurred. The court permitted some witnesses to testify as to the speed of the train when it passed through East Bernstadt. The evidence indicates that the point where the accident occurred was somewhere

from a half mile to a mile from East Bernstadt. One witness who was in East Bernstadt and noticed the train passing through testified that from experience in running trains and from observation he was able to judge as to their speed. He gave as his opinion that the train was running from 60 to 65 miles per hour when it passed. He heard the noise of the wreck and his evidence as to the intervening time would indicate that the train never slackened its speed. Authorities cited by appellant clearly indicate that the evidence as to the speed of a train at remote points would be incompetent but East Bernstadt was so near the place of the accident and the wreck followed so quickly after the train passed East Bernstadt as to make those authorities inapplicable. It is further urged that some witnesses were permitted to testify concerning the speed of the train who did not show themselves qualified to speak on that subject but the evidence of appellee and a number of other witnesses who did testify to facts that would disqualify them to give an opinion concerning the speed of the train testified that it was running some 60 to 65 miles per hour at the time of the accident. Physical facts as testified to by persons who were at the scene of the wreck also indicate beyond doubt that the train was running at a very high rate of speed. Some witnesses who observed the train just before and at the time of the wreck stated that it was running very fast or much faster than usual. The evidence of many witnesses who were qualified to testify concerning the speed of the train and the physical facts related by persons at the scene so overwhelmingly preponderate to sustain appellee's allegations that the train was running at a high and dangerous rate, considering the conditions at the point of the accident, as to leave no room for a conclusion that the evidence of one or two witnesses who may not have shown themselves qualified could have had a prejudicial effect.

It is further urged that the court erred in admitting evidence that appellant had erected and maintained a sign near the scene of the accident indicating the maximum speed at which a train should be run between it and the next station. It fixed the maximum speed for passenger trains at 35 miles per hour. The evidence shows there were many sharp curves near this point and unquestionably the maintenance of this sign was a necessary precaution on the part of appellant. Appellant

cites authorities to the effect that it is error to admit rules of a railroad company with reference to the engineer and fireman keeping a lookout, assisting passengers to alight from trains, etc., because its liability to one killed or injured does not depend upon a breach of duty employees owe the company but upon breach of duty to the injured party. These cases are easily distinguished. These signs clearly indicated what appellant regarded as a safe speed for trains to operate over the tracks where the accident occurred and the alleged excessive speed of the train was the basis of appellee's claim of negligence and we conclude that evidence concerning them was competent as bearing on that question.

The chief ground argued calls for a summary of the evidence bearing on the nature and extent of the injuries sustained by appellee. Appellee was a little over 42 years old at the time of the accident. He weighed about 200 pounds and was strong, vigorous and enjoyed good health. He was thrown from the car in which he was working and found by a negro and her children who lived nearby. There was a cut about 3½ inches long on the back of his head and cuts and bruises on his body and limbs. The negro woman and her children assisted him to her home where the wounds were washed. Later they assisted him back to the train where he secured or had someone secure for him valuable express packages from the safe. He was rendered some help in the way of first aid by way of bandaging his head and later was taken to the depot at East Bernstadt, where he remained until he took the bus to Lexington, where he lived. The next morning he called on Dr. McGinnis, physician for the Railway Express Company, who took or sent him to a hospital, but being dissatisfied with the treatment received there he left and returned to his home the following night. The next morning he called Dr. McGinnis, who took him to St. Joseph Hospital, also in Lexington, where he remained some days. In about five days he dismissed Dr. McGinnis and called Dr. Howard of Harlan and Dr. Robinson of Lexington. Dr. Howard had him sent to Graham Springs Sanitarium at Harrodsburg, where he was under treatment of Dr. Ballard for something over 60 days. He left this sanitarium of his own volition, and at the suggestion of Drs. Howard and Ballard went to Louisville, where he was examined by an eminent nerve specialist. He was later treated by Dr. Reister, a chiro-

practor in Lexington, and was examined by a number of other physicians. While he was in St. Joseph's Hospital and thereafter he had a number of X-ray pictures made showing the bones of his head, spine and pelvis. Appellee testified that he had lost the use of his left leg and right arm and that they were numb and without feeling; that shortly after the accident he had to resort to the use of crutches; that he was very nervous, sleepless and continually suffered great pain.

There is a very sharp conflict in evidence of lay witnesses introduced by respective parties; the evidence of witnesses for appellee being to the effect that he has lost weight, was very nervous and had little use of his right arm and left leg and has been using crutches continuously from a short time after the accident. On the other hand witnesses for appellant testified that they had seen appellee walking without the aid of crutches and apparently with little, if any, difficulty after he first begun using them.

When we come to the medical and expert evidence there is more marked conflict on some points but the evidence on the whole fully establishes the alleged negligence and shows beyond question that appellee sustained severe and painful injuries. The matter that gives us most concern is the evidence concerning the extent and probable duration of appellee's injuries and disability. The greatest external and visible evidence of injury was the cut on appellee's head, and other external evidence of injury, consisting of minor cuts, contusions and bruises.

Appellee called as a witness only one physician (Dr. Ballard) who had treated him for his injuries, although he was under treatment or had been examined by a number of others for consultation or advice in that connection. He also introduced as a witness a chiropractor who treated him a number of times and two physicians who had examined him two or three times for the purpose of testifying. While Dr. Ballard testified that appellee had little use of his left leg during the time he was under treatment at Graham Springs Sanitarium, there is nothing further in his evidence to indicate paralysis of that member and little in his evidence to indicate loss or impairment of the use of the right arm. Dr. Ballard's evidence further indicates that he was unable to determine the cause of the condition of appel-

lee's leg and some other conditions and therefore recommended that appellee go to Dr. Spurling, a nerve specialist, for examination. The evidence of the chiropractor and of the other two physicians introduced by appellee is to the effect that the trouble with appellee's left leg and right arm is paralysis; that as shown by the X-ray pictures, the paralysis or trouble with the arm and leg is caused by twisting and distortion of the spine, injury to and ossification of the cartilage between the vertebrae, causing pressure on the nerves; that appellee is permanently injured and disabled and will continue to suffer great pain.

Dr. McGinnis and the other physicians who treated appellee in the hospitals in Lexington testified that they found nothing to indicate injury to appellee's hip and leg except tenderness under pressure but that appellee had some difficulty in walking; that they found no condition that would cause paralysis, however, one of them testified that it was difficult to complete the examination because of intense pain in the left hip complained of by appellee. One of the physicians testified that he manipulated appellee's left leg, moving it backward, forward and to the side and that appellee made no complaint of pain caused by the manipulation. A number of these physicians who read X-ray pictures and J. Campbell Thompson, who has had years of experience in making and reading such pictures, testified that the pictures revealed nothing abnormal about the spine, pelvis or bones of the skull; that there was no twisting or distortion of the vertebrae or injury to the cartilage that would cause injury to or pressure on the nerves or that would result in paralysis of the leg or any part of the body. Dr. Spurling, a nerve specialist of unquestioned ability and reputation, testified that he made a complete neurological examination of appellee, including head, spine, body, extremities and nerves of the body, brain and spinal column and the activities of the muscles, sensation and reflexes; that he found no evidence of fracture and that all tests for structural disease proved negative with nothing to indicate pressure on nerves; that he then employed every known test to determine whether there had been an injury to the nerves, loss of feeling, etc.; that during the examination he noticed appellee resting his weight on his left leg and also noticed him taking papers from his inside pocket with his right hand which he claimed he was unable to use; that appel-

lee did not react when pricked by a pin on the left side but when turned over became confused and for a few seconds did not react to pin pricks on the other side. He further stated that it was possible for hysteric people to simulate and not show pain when pricked with a pin. He gave as his opinion that there was no organic disease of the nervous system but his trouble was altogether functional; that appellee's disorders were either largely imaginary or he was a malingerer.

Although there is a conflict in the evidence of physicians and experts, the preponderating weight of such evidence tends to sustain the contention of appellant, and not only so but evidence as to activities and the conduct of appellee from the time he received his injuries to the time of the trial, six months thereafter, in a very great measure corroborates the evidence of Dr. Spurling and other physicians and experts who testified for appellant.

Shortly after the accident some one offered to take appellee to a hospital in London a few miles away but he declined this offer and waited for a considerable time in East Bernstadt until he caught a bus and made the long trip to Lexington alone. He called a doctor the next morning and was taken to a hospital in Lexington but became dissatisfied and returned to his home the following night. The next day he was sent to another hospital, but in a few days became dissatisfied and dismissed the physician first called and called in two others. In a few days he was taken to Graham Springs Sanitarium, where he stayed for something over 60 days and finally left there of his own volition. In the meantime, however, he had made a number of trips to Lexington. He also made a number of trips to be examined by physicians in Louisville, Corbin and London. This evidence as to his activities and conduct so discredits and detracts from the evidence of his medical experts and those who treated him as to render it unsatisfactory and uncertain and to leave a decided impression at first blush that the verdict is excessive and palpably against the evidence as to the extent of appellee's injuries and the probable duration of his disability.

In the case of Louisville & Nashville Railroad Company v. Lewis, 211 Ky. 830, 278 S. W. 143, 148, which in all material respects bears close resemblance to the instant case, it was said:

"This court is committed to the doctrine that, when a verdict for personal injuries is so large that it could be sustained only if the injuries are permanent, there must be positive and satisfactory evidence of permanency. Illinois Central Railway Company v. Basham, 183 Ky. 439, 209 S. W. 362; Illinois Central Railway Company v. Houchins, 121 Ky. 626, 89 S. W. 530, 28 Ky. Law Rep. [490] 499, 1 L. R. A., N. S., 375, 123 Am. St. Rep. 205; Watson v. Brightwell, 82 S. W. 454, 28 Ky. Law Rep. 887; Louisville and Nashville Railroad Company v. Reaume, 128 Ky. 90, 107 S. W. 290, 32 Ky. Law Rep. 946; Louisville & N. Railroad Company v. Mattingly, 38 S. W. 686, 18 Ky. Law Rep. 823; Ky. Wagon Manufacturing Company v. Shake, 137 Ky. 742, 126 S. W. 1095. It must be conceded that a verdict for $25,000 is so large that it can be sustained only if the injury is permanent. The evidence to establish that appellee's injuries are permanent is too uncertain and unsatisfactory to measure up to the rule, supra. Under all the facts and circumstances of this case, the court cannot escape the conviction that a verdict for $25,000 reflects passion and prejudice upon the part of the jury, rather than a deliberate conclusion reached after an unbiased consideration of the evidence herein. The court holds the judgment to be excessive."

We have reached the same conclusion with respect to the verdict in this case.

In Louisville & Nashville Railroad Company v. Fox, 74 Ky. 495, 11 Bush 495, Judge Cofer, writing the opinion of the court, had this to say with respect to the appellate court interfering with the verdict of the jury:

"We concede that courts of all grades should exercise extreme caution in interfering with the verdicts of juries, and that an appellate court should hesitate not only because of the delicacy of undertaking to set aside the finding of the constitutional triers of fact, but because of the concurrence with the jury of the judge presiding at the trial. But if, after giving due weight to the verdict of the jury and the approval of the circuit judge, this court is clearly convinced, in a case in which the plaintiff is only entitled to recover compensatory damages, that the jury has gone beyond compensation and inflicted

punishment on the defendant under the influence of passion or prejudice, it is bound by the weightiest considerations of duty to direct a new trial. To refuse to do so is to abandon the defendant to the arbitrary will of the jury. The supervising control of the courts, both of original and appellate jurisdiction, is, in this country, an integral part of the jury system, and as indispensable to the right administration of justice as the panel of twelve men.''

Unquestionably as already stated, appellee sustained severe and painful injuries and the evidence would sustain a substantial verdict, however, for the same reasons assigned in Louisville & Nashville Railroad Company v. Lewis, supra, we unhesitatingly conclude that the verdict is excessive.

Wherefore, the judgment is reversed and cause remanded for a new trial.

Whole Court sitting.